**2015-1500, -1501**

In The

# United States Court of Appeals

### For The Federal Circuit

## ROBERT MANKES,

*Plaintiff – Appellant*,

v.

## VIVID SEATS LTD., FANDANGO, LLC,

*Defendants – Appellees*.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA IN CASE NOS. 5:13-cv-00717-FL AND 5:13-cv-00716-FL, JUDGE LOUISE WOOD FLANAGAN.

———————————

### BRIEF OF APPELLANT

———————————

Anthony J. Biller
David E. Bennett
COATS & BENNETT, P.L.L.C.
1400 Crescent Green, Suite 300
Cary, North Carolina  27518
(919) 854-1844
abiller@coatsandbennett.com
dbennett@coatsandbennett.com

*Counsel for Appellant*

## CERTIFICATE OF INTEREST

Counsel for Appellant, Anthony J. Biller, certifies the following:

1. The full name of every party or amicus presented by me is:

   Robert O. Mankes

2. The name of the real party in interest represented by me is:

   Robert O. Mankes

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae presented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Coats & Bennett, PLLC
   Anthony J. Biller
   David E. Bennett
   David D. Kalish
   James R. Lawrence, III

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ................................................ viii

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................2

      Statement of the Facts.................................................................3

SUMMARY OF THE ARGUMENT ......................................................5

STANDARD OF REVIEW ....................................................................6

ARGUMENT ........................................................................................6

I.     JOINT INFRINGEMENT LIABILITY UNDER THE
      LANGUAGE OF 35 U.S.C. § 271(a) ....................................6

        A.    The term "whoever" in 35 U.S.C. § 271(a) supports
             infringement through the action of multiple actors ...................6

        B.    35 U.S.C. § 271(b) and (c) are not superfluous to a
             broader interpretation of § 271(a)............................................10

        C.    The Supreme Court's ruling in *Akamai* did not address
             infringement under § 271(a) .....................................................11

II.    PATENT INFRINGEMENT SHOULD BE CONSISTENT
      WITH WELL ESTABLISHED PRINCIPLES OF TORT LAW .......13

A.    Common law tort principles support liability for infringement under § 271(a) ......................................................13

B.    Tort law provides for apportioning damages between the infringing parties .......................................................14

III.   PUBLIC POLICY FAVORS MULTI-PARTY INFRINGEMENT UNDER § 271(a)..................................................16

A.    The single-party interpretation undermines innovation and the purpose of the Patent Act ...............................................16

B.    Recognizing infringement in situations where parties are acting in concert will better serve the constitutional purposes of the patent laws .......................................................18

C.    Claim drafting is not a solution to the divided infringement problem.................................................19

IV.   JUDGE MOORE'S DISSENT IN *AKAMAI II* IS MERITABLE AND PERSUASIVE ........................................................20

V.   THE FACTS OF THIS CASE DEMONSTRATE MULTI-PARTY INFRINGEMENT UNDER § 271(a) ....................................21

A.    The actions of Fandango and their Exhibitor Partners are infringing the claims of the '503 patent under 35 U.S.C. § 271(a) .......................................................23

B.    The actions of Vivid Seats and their Sellers are infringing the claims of the '503 patent under 35 U.S.C. § 271(a) ...........23

CONCLUSION ..................................................................24

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Akamai Tech., Inc. v. Limelight Networks, Inc.* (*Akamai I*),
    692 F.3d 1301 (Fed. Cir. 2012) ....................................................9, 12, 19, 20

*Akamai Tech., Inc. v. Limelight Networks, Inc.* (*Akamai II*),
    No. 2009-1372, 2015 WL 2216261 (Fed. Cir. May 13, 2015) .............*passim*

*BMC Resources v. Paymentech*,
    498 F.3d 1373 (Fed. Cir. 2007) ....................................................................19

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ......................................................................6

*Carbice Corp. of Am. v. Am. Patents Dev. Corp.*,
    283 U.S. 27 (1931)........................................................................................13

*Deepsouth Packing Co. v. Laitram Corp.*,
    406 U.S. 518 (1972).......................................................................................9

*Envtl. Mfg. Solutions, LLC v. Peach State Labs, Inc.*,
    No. 6:09-CV-395-ORL, 2011 WL 1262569 (M.D. Fla. 2011) ......................8

*Gustafson v. Alloyd Co. Inc.*,
    513 U.S. 561 (1995).......................................................................................8

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    134 S. Ct. 2111 (2014)........................................................................10, 11, 12

*McKesson Info. Solutions LLC v. Epic Sys. Corp.*,
    No. 1:06–CV–2965–JTC, 2009 WL 2915778 (N.D. Ga. 2009) ..................18

*Meyer v. Holley*,
    537 U.S. 280 (2003)......................................................................................14

*Muniauction v. Thompson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ............................................................... 1, 11

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) ...................................................................................... 16

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) .................................................................................... 16

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) ...................................................................................... 8

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ................................................................... 19

*United States v. Texas*,
    507 U.S. 529, 113 S. Ct. 1631 (1993) ......................................................... 14

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ...................................................................................... 14

## CONSTITUTIONAL PROVISION

U.S. CONST. art. I, § 8, cl. 8 ......................................................................... 18

## STATUTES

1 U.S.C. § 1 .................................................................................................... 7

28 U.S.C. § 1295(a)(1) ..................................................................................... 1

35 U.S.C. § 101 ............................................................................................... 7

35 U.S.C. § 112(b) ........................................................................................ 19

35 U.S.C. § 116 ............................................................................................... 8

35 U.S.C. § 154 ......................................................................................... 9, 10

35 U.S.C. § 161 ............................................................................................... 7

35 U.S.C. § 171 ...................................................................................................7

35 U.S.C. § 271 ............................................................................................9, 14

35 U.S.C. § 271(a) ....................................................................................*passim*

35 U.S.C. § 271(b) ...................................................................................10, 11

35 U.S.C. § 271(c) ...........................................................................................10

## RULES

Fed. R. App. P. 4(a)(1)(A) .............................................................................1

Fed. R. Civ. P. 12(c).......................................................................................6

## OTHER AUTHORITIES

3 Abraham Lincoln, *The Collected Works of Abraham Lincoln*
(Roy P. Basler ed., 1953) .......................................................................16, 17

Stacie L. Greskowiak, Note, *Joint Infringement After BMC:*
*The Demise of Process Patents*, 41 Loy. U. Chi. L. J. 351 (2010).........................18

H.R. Rep. No. 82-1923 (1952).............................................................. 9-10

Mark A. Lemley et al., *Divided Infringement Claims*,
AIPLA Q.J. 255 (2005)...................................................................................19

*Restatement (Second) of Torts* § 875 (1979) ............................................13

*Restatement (Second) of Torts* § 875, cmt. c (1979)................................13

*Restatement (Second) of Torts* § 876(a) (1979) .......................................14

*Restatement (Second) of Torts* § 876, cmt. a (1979)................................14

*Restatement (Second) of Torts* § 881 (1979) ............................................15

THE NEW OXFORD AMERICAN DICTIONARY (2001) ....................................................7

Transcript of Oral Argument, *Limelight*, 134 S. Ct. 2111 (No. 12-786),
*available at* http://www.supremecourt.gov/oral_arguments/argument_
transcripts/12-786_i4dj.pdf .....................................................................................12

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellants provide as follows:

(a) There have been no previous appeals in this case.

(b) They are aware of no other case that will be directly affected by the

Court's decision in this case.

## STATEMENT OF JURISDICTION

On February 26, 2015, the court entered a final judgment for Vivid Seats of non-infringement.  (A10.)  Similarly, on March 5, 2015 a judgment of non-infringement was entered for Fandango.  (A20.)  On March 13, 2015, Mr. Mankes timely filed Notices of Appeal challenging both decisions.  Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

l. If separate entities each perform separate steps of a method claim, under what circumstances would that claim be directly infringed and to what extent would each of the parties be liable.

2. Whether this Court should overrule the holdings in *Muniauction v. Thompson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008) and *Akamai Technologies, Inc. v. Limelight Networks, Inc.* (*Akamai II*), No. 2009-1372, 2015 WL 2216261 (Fed. Cir. May 13, 2015) that a method claim is not infringed unless a single party is responsible for the performance of all steps of the claimed invention.

3. Whether Mr. Mankes pled a viable cause of action for patent infringement.

## STATEMENT OF THE CASE

The appeals at issue arise from two judgments on the pleadings directed to the issue of direct patent infringement under 35 U.S.C. § 271(a) when the actions of multiple parties together perform all the steps of the claimed method.  In both cases, the district court held that there is no direct infringement because no one party performs all the steps of the claimed invention.

On October 14, 2013, Mr. Mankes filed separate lawsuits in the Eastern District of North Carolina against Vivid Seats Ltd. ("Vivid Seats") and Fandango, LLC. ("Fandango").  (A51-A60.)  Each lawsuit was for infringement of U.S. Patent No. 6,477,503 ("the '503 patent").  (A68-A83.)  In each of the suits, Mr. Mankes admitted that no one party performed all the steps of the claimed invention, but that the respective parties' business partners performed the remainder of the claimed steps.  (A2.)

Prior to conducting discovery on the substantive issues of the cases, both Vivid Seats and Fandango moved for judgment on the pleadings.  On February 26, 2015, the court entered a judgment for Vivid Seats of non-infringement.  (A10.) Similarly, on March 5, 2015 a judgment of non-infringement was entered for Fandango.  (A20.)  On March 13, 2015, Mr. Mankes timely filed Notices of Appeal challenging both decisions.  By order entered May 20, 2015, this Court consolidated the appeals.

**Statement of the Facts**

Robert Mankes is a retired North Carolina state government employee.  He is also an independent inventor.  Mr. Mankes pursues a passion he shares with many other North Carolinians: he likes to play golf.  Mr. Mankes also founded and operated a golf reservation services company.  Mr. Mankes learned that golf courses were struggling to manage tee times.  He observed that golf courses needed to accommodate golfers who made reservations in advance through, e.g., a phone reservation service.  At the same time, golf courses had to accommodate same-day traffic.  To avoid double booking, golf courses would maintain a separate inventory of tee times, one for walk-up customers and another for those who made advance reservations.  Mr. Mankes learned that this system was plagued by expensive inefficiencies.  If walk-up tee times were filled, the golf course could not accommodate walk-up customers even if "advance" inventory was available.  Conversely, if "advance" inventory was exhausted, golfers trying to book tee times in advance could not do so even if walk-up tee times were still available.  Golf courses lost bookings and business as a result.  Mr. Mankes realized this inventory control and allocation problem was common to many industries that offered reservations.

Mr. Mankes solved these problems through the invention described in U.S. Patent No. 6,477,503.  (A68-A83.)  The '503 patent discloses an active reservation

system. (A68.) The system features a local inventory server and a remote Internet inventory server. (A76.) Mr. Mankes's invention provides an integrated inventory management solution for vendors like golf courses. Harnessing Internet commerce, the '503 patent provides a method for a vendor to manage its local inventory at the same time it offers inventory for sale through a remote platform. Through Mr. Mankes's invention, a vendor can accommodate local walk-up customers while also enabling remote, advance reservations. Recognizing the value of Mr. Mankes's invention, a golf reservation service provider purchased an exclusive license to practice the '503 patent in conjunction with golf reservations. Mr. Mankes's invention is not, however, limited to golf courses. It applies to any industry with the same inventory management problems, including the hospitality, entertainment, transportation, and retail markets.

Fandango operates a reservation system for selling movie tickets. Movie theaters throughout the United States use the Fandango reservation system to sell movie tickets. Fandango refers to these movie theaters as its "Exhibitor Partners." Fandango's Exhibitor Partners allocate their available ticket inventory between a local inventory for sale to walk-up consumers and an online inventory of tickets for sale to Internet-based consumers through Fandango. The Exhibitor Partners update their available inventory based on walk-up sales and communicate their available ticket inventory to Fandango. When Internet-based consumers make ticket

purchases through Fandango, the Exhibitor Partners update their available ticket inventory accordingly. Fandango confirms ticket sales to Internet-based consumers who purchase tickets using its service.

Vivid Seats also uses and operates an Internet-based reservation system for reserving, buying, and selling tickets to sporting events, concerts, and theatrical performances throughout the United States. The Vivid Seats system is used by professional ticket resellers and individual sellers "pre-screened" by Vivid Seats (collectively, the "Sellers") to sell tickets to events to Internet-based consumers. The Sellers allocate their available ticket inventory between a local inventory and an online inventory of tickets for sale to Internet-based consumers through Vivid Seats' system. The Sellers update their available ticket inventory based on local sales and communicate their available ticket inventory to Vivid Seats. When Internet-based consumers make ticket purchases through Vivid Seats, the Sellers update their available ticket inventory accordingly. Vivid Seats confirms ticket sales to Internet-based consumers who purchase tickets using its service.

## SUMMARY OF THE ARGUMENT

This Court should interpret 35 U.S.C. § 271(a) to find infringement where the steps of a claimed invention are each performed by the acts of multiple parties, without the requirement that the parties had a principal-agent relationship, contractual relationship, or were involved in a joint enterprise. This statutory

5

construction is supported by the language of § 271(a) itself that uses the term

"whoever" to include the acts of multiple parties. The broader interpretation is

also consistent with tort law principles that address situations in which a party is

injured by the acts of multiple parties. Finally, public policy considerations favor

focusing the infringement analysis on the use of a patented invention instead of

focusing on the nature of the relationship between those implementing the

invention.

## STANDARD OF REVIEW

The district court granted Vivid Seats and Fandango judgment on the

pleadings under Fed. R. Civ. P. 12(c). This Court reviews a "grant of judgment on

the pleadings de novo." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed.

Cir. 2014).

## ARGUMENT

I.  **JOINT INFRINGEMENT LIABILITY UNDER THE LANGUAGE OF
    35 U.S.C. § 271(a)**

   A.  **The term "whoever" in 35 U.S.C. § 271(a) supports infringement
       through the action of multiple actors.**

35 U.S.C. § 271(a) identifies those liable for patent infringement. The statute

provides "[e]xcept as otherwise provided in this title, ***whoever*** . . . ." (emphasis

added). The word "whoever" includes within its scope infringing actions by more

than one party.

The ordinary meaning of the word "whoever" includes multiple parties. *The New Oxford American Dictionary* is the authoritative dictionary for American English. It defines "whoever" as "the person or people who . . . ." THE NEW OXFORD AMERICAN DICTIONARY 1926 (2001). Further, the United States Code requires that unless indicated to the contrary words that import the singular include and apply to multiple parties. 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things . . . ."). Accordingly, the word "whoever" as found in the Patent Act should be construed to include multiple parties.

Indeed, "whoever" has been consistently construed to include multiple parties in the rest of the Patent Act. The word "whoever" appears in other sections of Title 35, including §§ 101, 161, and 171. The usage in these sections also does not distinguish between single and plural parties. It is well established that these other sections cover the actions of multiple parties. 35 U.S.C. § 101 includes "[w]hoever invents or discovers any new and useful process . . . ." 35 U.S.C. § 161 reaches "[w]hoever invents or discovers and asexually reproduces any distinct and new variety of plant . . . ." 35 U.S.C. § 171 includes "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor . . . ." Each of these sections provides for multiple parties

7

to be named as co-inventors when working together on an invention. *See*, *e.g.*, *Envtl. Mfg. Solutions, LLC v. Peach State Labs, Inc.*, No. 6:09-CV-395-ORL, 2011 WL 1262569, at *11 (M.D. Fla. 2011) (treating "whoever" as applying to more than one person in the situation of joint inventors). The Act itself acknowledges that these sections allow for the naming of multiple inventors on an application for the various different types of inventions. *See* 35 U.S.C. § 116 ("When an invention is made by two or more persons jointly, they shall apply for patent jointly . . . .").

Section 271(a) should be interpreted in this same manner to address the actions of multiple parties. The same term should be construed consistently and have the same meaning when used in separate sections of a statute. *See Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 568 (1995) (holding the term "prospectus" is interpreted consistently when used in the different sections of the Securities Act of 1933); *see also Akamai II*, 2015 WL 2216261 at *16 (Moore, J., dissenting) (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) for the following proposition: "[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.") Like the Supreme Court in *Gustafson*, this Court should adopt "the premise that [a] term should be construed, if possible, to give it a consistent meaning throughout the Act." *Gustafson*, 513 U.S. at 568.

The legislative history of 35 U.S.C. § 271 further supports that the term "whoever" should be interpreted to include infringement by the actions of multiple parties. Prior to the Patent Act of 1952, there was no statute that included an express prohibition of patent infringement. The provisions of 35 U.S.C. § 271(a) are in accordance with the rights of a patent owner defined in 35 U.S.C. § 154. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 522 (1972). Section 154[1] is the keystone of the patentee's right to exclude others from practicing the patented invention. *Id*. The legislative history of the Patent Act defines the relationship between § 154 and § 271, and explains that § 271(a) was superfluous:

> Section 271, paragraph (a), is a declaration of what constitutes infringement. There is no declaration of what constitutes infringement in the present statute. It is not actually necessary because the granting clause [35 U.S.C. § 154] creates certain exclusive rights and infringement would be any violation of those rights.

*Akamai Tech., Inc. v. Limelight Networks, Inc.* (*Akamai I*), 692 F.3d 1301, 1323 (Fed. Cir. 2012) (Newman, J., dissenting) (citing H.R. Rep. No. 82-

---

[1] 35 U.S.C. § 154 recites:
(a) In General.—
(1) Contents.— Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

9

1923, at 9 (1952)), *overruled by Limelight Networks, Inc. v. Akamai Tech.,*

*Inc.*, __ U.S. __, 134 S. Ct. 2111 (2014).[2]  Section 154 of the Act expressly

contemplates excluding the plural "others" from exercising the rights of the

patent.  The grant of rights is not limited to where the right is violated by a

single actor.

### B.    35 U.S.C. § 271(b) and (c) are not superfluous to a broader interpretation of § 271(a)

Sections 271(a), (b), and (c) each focus on different aspects of infringing

activity.  An interpretation that the term "whoever" as used in § 271(a) covers

multiple parties would not render § 271(b) and § 271(c) superfluous.  Sections

271(b) and (c) would still apply to cover activities that would not fall within the

scope of infringement under § 271(a).

One example of such an activity is when one party induces another to

perform all the steps of a method claim.  The inducing party would be liable for

infringement under § 271(b), but would not be liable for infringement under

§ 271(a). *See Akamai II*, 2015 WL 2216261 at *18 (Moore, J., dissenting)

---

[2] The Patent Act of 1952 enacted §§ 271(a), (b), and (c) to address the issues of patent infringement that had occurred under common law. Section 271(a) was included for purposes of completeness to cover the most basic aspects of infringement. The provisions included in §§ 271(b) and 271(c) address the more specific aspects of infringement through inducement and contributory infringement. As such, these sections cover situations that are not applicable to § 271(a). For example, sections (b) and (c) may apply to a situation in which a party themselves performs none of the claimed steps, but either induces or otherwise contributes to the infringement by another.

(discussing this situation). The inducing party in this scenario is not a direct infringer as they are not performing any of the claimed steps and therefore are not using the invention which is a requirement for infringement under § 271(a).

### C.     The Supreme Court's ruling in *Akamai* did not address infringement under § 271(a).

The Supreme Court previously granted certiorari to determine whether the Federal Circuit erred in its holding of inducing patent infringement under 35 U.S.C. § 271(b) despite there being no direct infringement under 35 U.S.C. § 271(a). *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2120 (2014). The Court overturned the *en banc* Federal Circuit and held that liability for inducement under § 271(b) must be predicated on infringement under § 271(a). *Id.* at 2114. In explaining its decision, the Court repeatedly indicated that its holding was based solely on the provision of § 271(b) without ruling on the standard for § 271(a). The Court refused to address the issue of multi-party infringement under § 271(a). *See id.* at 2117, 2119 (noting "[a]ssuming without deciding that the Federal's Circuit holding in *Muniauction* is correct…"; "*Muniauction* (which, again, we assume to be correct)…"; and "[b]ut the possibility that the Federal Circuit erred by too narrowly circumscribing the scope of § 271(a) is no reason for this Court to err a second time by misconstruing § 271(b) to impose liability for inducing infringement where no infringement has occurred").

11

The Court in *Akamai* appeared sympathetic to the argument that the current standard for multi-party infringement under § 271(a) is incorrect. The opinion concludes with the clearest indication:

> Finally, respondents, like the Federal Circuit, criticize our interpretation of § 271(b) as permitting a would-be infringer to evade liability by dividing performance of a method patent's steps with another whom the defendant neither directs nor controls. We acknowledge this concern. Any such anomaly, however, would result from the Federal Circuit's interpretation of § 271(a) in *Muniauction*. A desire to avoid *Muniauction's* natural consequences does not justify fundamentally altering the rules of inducement liability that the text and structure of the Patent Act clearly require – an alteration that would result in its own serious and problematic consequences, namely, creating for § 271(b) purposes some free-floating concept of "infringement" both untethered to the statutory text and difficult for the lower courts to apply consistently.

*Id*. at 2120.[3]  Thus, the Court has not ruled on the viability of multi-party infringement under  § 271(a).

---

[3] At oral argument, several members of the Court expressed misgivings about the Federal Circuit's single-entity rule. Chief Justice Roberts said the rule makes it "pretty easy to . . . get around patent protection" by having "someone else" perform a step in the patented method. Transcript of Oral Argument at 5:21-23, *Limelight*, 134 S. Ct. 2111 (No. 12-786), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-786_i4dj.pdf. Justice Kagan likewise sensed "the [Federal Circuit] judges [in *Akamai I*] thought there was a real problem here in terms of an end run" around patent law. *Id*. at 16:12-13. Justice Scalia criticized how under the single-entity rule "hav[ing] another person do some of the steps" could lead to "stealing the idea" disclosed in a patent. *Id*. at 7:21-24. Justice Alito flatly demanded a "policy reason" for why "there was not infringement on the facts here." *Id*. at 18:20, 18:23.

## II.    PATENT INFRINGEMENT SHOULD BE CONSISTENT WITH WELL ESTABLISHED PRINCIPLES OF TORT LAW

In construing § 271(a), this Court should look to established tort principles that address the harm inflicted on a party that is caused by the actions of others.

### A.    Common law tort principles support liability for infringement under § 271(a).

Patent infringement is essentially a tort. *Carbice Corp. of Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33 (1931) ("Infringement, whether direct or contributory, is essentially a tort, and implies invasion of some right of the patentee."). Tort law recognizes that the actions of parties might combine together to cause a wrong. The *Restatement (Second) of Torts* provides:

> [e]ach of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

*Restatement (Second) of Torts* § 875 (1979).  The *Restatement* also acknowledges that "it is implicit that any one of a number of persons whose tortious conduct is a substantial factor in causing harm is liable for the harm in the absence of a superseding cause." *Id.* § 875 cmt. c.

Tort liability further applies to persons that are acting in concert that cause harm to a third party.  Again, the *Restatement* provides:

> [f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in

> concert with the other or pursuant to a common design with him
> . . . .

*Id.* § 876(a).  Parties act in concert when they act in agreement to accomplish a line of conduct or result.  The agreement may be expressed in words or may be implied and understood to exist from the conduct itself. *Id.* § 876 cmt. a.

These principles of tort law were incorporated into the Patent Act. "[W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  If Congress intends to change an existing common law principle, they must clearly indicate this departure from the common law.  *United States v. Texas*, 507 U.S. 529, 534, 113 S. Ct. 1631, 1634 (1993).  There is no indication in the legislative history of § 271 to exclude accepted principles of common law tort law. Further, the courts have interpreted the Patent Act consistently with previously-established tort principles. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 26 (1997) ("[P]re-1952 precedent survived the passage of the 1952 Act.").

### B.    Tort law provides for apportioning damages between the infringing parties.

Liability flows from infringement.  Once a determination is made that direct infringement has occurred due to the combined actions of the multiple parties, the liability for each of the parties may be determined based on whether the

performance of one or more of the claimed steps by the party is a substantial and causative part of the resulting harm. A demonstration of infringement by multiple parties should not require the establishment of an agency, joint enterprise, or contractual relationship between the different parties.

Separating the issue of infringement from the issue of liability addresses many of the issues raised in prior decisions directed to multiple-party infringement actions. A party performing the heart or essence of the claimed invention would be allocated a greater amount of liability, perhaps all. Likewise, the innocent infringer who happens to perform one of the steps of the claimed method would be protected from unfair liability through this second step of the analysis. This party would be shielded from the overt actions of the mastermind.

The common law counsels this result. An innocent party that performs one or more of the claimed steps would not be subject to joint and several liability for the overall actions that damaged the patentee. The *Restatement (Second) of Torts* provides:

> If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

*Restatement (Second) of Torts* § 881 (1979). Thus, a customer that performs a single step of a patented method would have liability apportioned to their

15

involvement. *Cf. Akamai II*, 2015 WL 2216261 at *9 (raising concern that customer who performs a single step of a patented method would incur joint and several liability). The solution to the innocent infringer problem is to apply the common law of joint tortfeasor liability—not to rewrite the Patent Act.

## III. PUBLIC POLICY FAVORS MULTI-PARTY INFRINGEMENT UNDER § 271(a)

A variety of different public policy considerations undermine the current interpretation of single party infringement under § 271(a) and favor the expansion of infringement to cover the actions of multiple parties.

### A. The single-party interpretation undermines innovation and the purpose of the Patent Act.

Patents are "affected with a public interest" and are "designed to serve the public purpose of promoting the Progress of Science and useful Arts." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945) (internal quotations omitted). In exchange for disclosing new and non-obvious inventions, inventors are granted an exclusive right to practice their inventions for a limited time. This is "a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998). As Abraham Lincoln explained, "[t]he patent system . . . added the fuel of interest to the fire of genius." Abraham Lincoln, Second Lecture on Discoveries and Inventions, Address Before the Young Men's

Association of Bloomington, Illinois (Feb. 11, 1859), *in* 3 Abraham Lincoln, *The Collected Works of Abraham Lincoln*, at 356, 363 (Roy P. Basler ed., 1953).

The single-party rule for infringement undermines the careful balance of interests underlying the patent laws by denying effective protection to patented processes involving steps that can be divided between two or more entities. The single-party rule creates a loophole that allows two or more parties acting in concert to avoid infringement unless one is under the narrowly construed direction or control of the other. Under this standard, anyone can benefit from the use of a patented process and avoid liability by dividing the steps of the patented process among two or more participants through arms-length transactions without any one participant directing or controlling the actions of the other participants. The single-party rule leaves a meritorious patentee without an effective remedy for infringement. The district court in a companion case to *Akamai I* made the point this way:

> [T]he single entity rule and *BMC*'s interpretation thereof severely limits the protection provided for patents which would otherwise be valid and enforceable. A potential infringer seeking to take advantage of a patented process could likely avoid infringement simply by designing its otherwise infringing product in a way that allows customers to decide initially whether to access it. As long as the sale of a product constitutes an arm's length transaction between the customer and the infringing company, which is insufficient to create vicarious liability, the patent holder would likely have no redress against the infringer. This result weakens the policy of providing protection to those who devote the time and resources to develop otherwise novel and patentable methods.

17

*McKesson Info. Solutions LLC v. Epic Sys. Corp.*, No. 1:06–CV–2965–JTC, 2009 WL 2915778, at *7 (N.D. Ga. 2009).  The lack of an effective remedy for patent infringement in divided infringement cases renders many patents on important technologies virtually unenforceable, weakens the incentive to invest in innovation, and undermines the constitutional purpose of the patent laws "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8.

> **B.    Recognizing infringement in situations where parties are acting in concert will better serve the constitutional purposes of the patent laws.**

Protection of an innovative process is best afforded when the claims are focused on the essential steps of the process rather than on the actors. This serves the purpose of promoting innovation by ensuring that inventors are compensated for the use of their invention.  This compensation is the "driving force that incentivizes innovation." Stacie L. Greskowiak, Note, *Joint Infringement After BMC: The Demise of Process Patents*, 41 Loy. U. Chi. L. J. 351, 358 (2010). Rules of law that deny inventors compensation for use of their inventions would profoundly impact on the incentive to innovate.  Claims directed to the essential steps will also more clearly define the scope of the patent right and provide notice of what constitutes an infringement.  The clear delineation of the scope of the patent also serves the purposes of promoting innovation while protecting the public.

### C.    Claim drafting is not a solution to the divided infringement problem.

Some have suggested that the problem is poor claim drafting which can be solved by drafting claims from the perspective of a single party. *See*, *e.g.*, *BMC*, 498 F.3d at 1381("A patentee can usually structure a claim to capture infringement by a single party.") (citing Mark A. Lemley et al., *Divided Infringement Claims*, AIPLA Q.J. 255, 272–75 (2005)); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) (noting that the issue of multiple party infringement not applicable because claim drafted in a manner that infringement occurs through the actions of a single party).  The assumption that single-party claims can adequately protect innovative processes is incorrect and the assumption that the claim drafter can anticipate all possible schemes that a knowing infringer might employ to circumvent the patent is unreasonable.  The claim drafter should be free to draft clams that unambiguously define the invention and not be held prisoner of a formula necessitated by the inadequacy of the rule of law protecting innovation. The single-party rule forces the claim drafter to draft claims, not to what an inventor "regards as the invention" as the Patent Act requires, 35 U.S.C. § 112(b), but to specific embodiments of the invention.  Reliance on single party claims focused on a single party to protect investment in innovative processes is therefore a very poor substitute for claims focused on the essential elements of the invention. As Judge Newman noted in *Akamai I*, "the presence or absence of infringement

should not depend on cleverness or luck to satisfy a malleable single party rule."

*Akamai I*, 692 F.3d at 1325 (Newman, J., dissenting).

The problem is not with claim drafting, but with the narrow single-party rule that denies protection to processes involving steps that can be divided among multiple parties.  This fundamental flaw in the single-party rule cannot be fixed by clever claim drafting.

## IV.    JUDGE MOORE'S DISSENT IN *AKAMAI II* IS MERITABLE AND PERSUASIVE

This Court recently ruled on the issue of multiple party infringement under 35 U.S.C. § 271(a) in *Akamai II*.  The majority opinion held that direct infringement of a method claim under § 271(a) only exists when all the steps are performed by a single entity, such as would exist in a principal-agent relationship, contractual arrangement, or a joint enterprise.  *Akamai II*, 2015 WL 2216261 at *1.

In dissent, Judge Moore articulated a more compelling rationale as to why this single-entity interpretation is too narrow when determining multiple party infringement under § 271(a).  Judge Moore supports a broader interpretation by explaining the history of the existing single-entity rule and how the common law supports joint infringement liability under § 271(a).  *Id.* at *16–21 (Moore, J., dissenting).

Judge Moore further defines the issue of joint infringement under § 271(a) as being an issue of statutory construction. *Id.* at *17.  Both the text of the statute

and its context necessitate a finding that § 271(a) applies to a broader interpretation of multi-party infringement. *Id.* The majority opinion's restrictive interpretation results in unintended gaping loopholes.

Judge Moore provides examples of multiple party actions in the context of the majority's holding to demonstrate that this cannot be the proper interpretation of the statute:

> For example, consider the following scenario. Party A intentionally induces party B to perform each and every step of a method claim. Unquestionably, party B is a direct infringer under § 271(a) and party A is an inducer under § 271(b). Switching the facts only slightly, assume that party A performs the first step in the claimed method and then, with the same knowledge and intent, induces party B to perform the remaining steps. Under the majority's rule, neither party is liable, even though the harm to the patentee remains the same. Party A is not even liable as an inducer because, under the single entity rule, no direct infringement has occurred.

*Id.* Judge Moore rightly questions an interpretation of § 271(a) that would result in this gaping loophole, particularly since there is no indication Congress intended to create such a situation when enacting the 1952 Patent Act. *Id.* at 43.

## V. THE FACTS OF THIS CASE DEMONSTRATE MULTI-PARTY INFRINGEMENT UNDER § 271(a)

The '503 patent is directed to a reservation system and methods of using the reservation system. (A21-A36.) The system can be used by vendors of goods or services, such as movie theaters, restaurants, sporting event organizers, etc. (A33, col. 4, ll. 57-61.) The reservation system facilitates the sale of the goods and

services for both local sales (e.g., walk-up sales) that are handled by the vendor and Internet sales that are handled through the system.  (A33, col. 3, ll. 19-42.) The reservation system allows the vendor to maintain control over their inventory by separately allocating between local sales and Internet sales.  (*Id.*)  Based on the amount of local sales, the vendor is able to adjust the inventory as necessary.  (*Id.*)

While using the system to manage the inventory, the vendor sends inventory information to the system regarding the amount of Internet inventory.  (A35, col. 8, ll. 33-67.)  The system receives the inventory information and formats it for viewing by consumers over the Internet.  (*Id.*)  After the system lists the inventory on the Internet, the system receives purchase requests from Internet-based consumers who want to purchase the goods/services.  (*Id.*)  The system communicates the requests to the vendor who is able to accept the requests and adjust the Internet inventory accordingly.  (*Id.*)  The system further provides for the vendor to communicate the acceptance and the adjusted Internet inventory to the reservation server, who notifies the Internet-based consumers of the accepted purchase.  (*Id.*)

The actions of Fandango and their Exhibitor Partners and Vivid Seats and their Sellers together perform each of the steps of the claimed invention.  Fandango and Vivid Seats respectively provide for Internet sales while the Exhibitor Partners

and Sellers respectively provide for the local sales.  The actions of these parties

together perform all the steps of the claimed invention.

### A.    The actions of Fandango and their Exhibitor Partners are infringing the claims of the '503 patent under 35 U.S.C. § 271(a).

Fandango's Exhibitor Partners allocate their available ticket inventory

between a local inventory for sale to walk-up consumers and an online inventory of

tickets for sale to Internet-based consumers through Fandango.  The Exhibitor

Partners update their available inventory based on walk-up sales and communicate

their available ticket inventory to Fandango.  When Internet-based consumers

make offers to purchase tickets, Fandango communicates this to the Exhibitor

Partner.  The Exhibitor Partners accept the offer, communicate the acceptance to

Fandango, and update their available ticket inventory accordingly.  Fandango

confirms ticket sales to the Internet-based consumers.  The combined acts of

Fandango and their Exhibitor Partners perform each of the steps of the '503 patent.

Therefore, the '503 patent is being infringed by these parties under § 271(a).

### B.    The actions of Vivid Seats and their Sellers are infringing the claims of the '503 patent under 35 U.S.C. § 271(a).

Vivid Seat's Sellers include professional ticket resellers and individual

sellers "pre-screened" by Vivid Seats to sell tickets to live events to Internet-based

consumers.  The Sellers allocate their available ticket inventory between a local

inventory and an online inventory of tickets for sale to Internet-based consumers

through Vivid Seats' system.  The Sellers update their available ticket inventory based on local sales and communicate their available ticket inventory to Vivid Seats.  When Internet-based consumers offer to purchase tickets through Vivid Seats, the Sellers accept the offers and update their available ticket inventory accordingly.  The Sellers communicate the acceptance to Vivid Seats who then confirms the ticket sales to the Internet-based consumers.  The combined acts of Vivid Seats and their Sellers are performing each of the steps of the '503 patent.  These acts together infringe the '503 patent under § 271(a).

## CONCLUSION

The judgments of the district court should be reversed.

Dated: June 19, 2015

Respectfully submitted,

/s/ Anthony J. Biller
Anthony J. Biller
Principal Counsel

/s/ David E. Bennett
David E. Bennett
Co-counsel

COATS & BENNETT, P.L.L.C.
1400 Crescent Green, Suite 300
Cary, NC   27518

Telephone:  (919) 854-1844
Facsimile:    (919) 854-2084
abiller@coatsandbennett.com
dbennett@coatsandbennett.com

*Counsel for Appellant*

# ADDENDUM

# TABLE OF CONTENTS

**Addendum Page**

Order of
The Honorable Louis W. Flanagan
Re:  Granting Defendant's Motion for Judgment on the
Pleadings and Directing the Clerk to Close the Case
(Record No. 5:13-cv-00717-FL)
      filed February 26, 2015 .........................................................................Add. 1

Judgment
(Record No. 5:13-cv-00717-FL)
      filed February 26, 2015 ......................................................................Add. 10

Order of
The Honorable Louise W. Flanagan
Re:  Granting Defendant's Motion for Judgment on the Pleadings and
Holding in Abeyance Decision on Plaintiff's Motion to Dismiss
(Record No. 5:13-cv-00716-FL)
      filed February 26, 2015 ....................................................................Add. 11

Judgment
(Record No. 5:13-cv-00716-FL)
      filed March 5, 2015...........................................................................Add. 20

U.S. Patent No. 6,477,503.........................................................................Add. 21

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.  5:13-CV-717-FL

| | | |
|---|---|---|
| ROBERT MANKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| VIVID SEATS LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).  (DE 36).  The issues raised have been fully briefed and are ripe for ruling.  For the reasons stated below, defendant's motion is granted.

## STATEMENT OF THE CASE

Plaintiff, inventor and owner of United States Patent Number 6,477,503 ("the '503 patent") which is generally directed to a reservation system that controls inventory, filed complaint October 14, 2013, against defendant, an internet ticket seller.[1]  The complaint alleges defendant directly infringed the '503 patent in violation of 35 U.S.C. § 271(a) and induced infringement of the '503 patent, in violation of 35 U.S.C. § 271(b).  On February 28, 2014, plaintiff filed amended complaint, providing more factual specificity regarding defendant's accused infringing actions.

---

[1]  On the same date a corresponding lawsuit was filed by plaintiff against another operator of a reservation system aimed at selling tickets, alleging similar violations of or relating to the '503 patent.  Robert Mankes v. Fandango, L.L.C., 5:13-CV-716-FL.  Order entered this date in that case disposes of defendant's motion for judgment on the pleadings on the same grounds as here.

Plaintiff alleges a system operated by defendant which is used by professional ticket resellers and "pre-screened" individual sellers to allocate available ticket inventory between local and online inventory for sale to internet-based customers which uses some of the steps of the claimed invention. The other steps of the invention allegedly are induced by defendant to be performed by its customers. Plaintiff seeks a declaration of infringement, an injunction, accounting, and damages.

Defendant denied liability in answer filed April 7, 2014. Thereafter the court initiated the parties' planning and scheduling activities and the following day, on April 11, 2014, the parties jointly moved to stay proceedings pending the outcome of the United States Supreme Court's decision in Limelight Networks, Inc. v. Akamai Technologies, Inc., 134 S. Ct. 2111 (2014). The Supreme Court issued its opinion in Limelight Networks on June 2, 2014, and after some maneuvering related to the Federal Circuit's response to that decision, and whether a continued stay of this case, as urged by plaintiff, would be appropriate, ultimately stay was lifted. On October 15, 2014, defendant filed the instant motion.

Briefly, defendant argues plaintiff's allegations belie both his infringement and inducement claims. In particular, defendant argues plaintiff has not alleged direct infringement, where he fails to allege defendant performs every step of any claim, or that defendant exercises control over other parties committing some of the steps of the claimed methods. In addition, defendant contends plaintiff has not alleged inducement, as the facts do not support the inference the '503 patent has been directly infringed.

Plaintiff does not dispute that no one entity performs every step of any claim. Rather, plaintiff contends defendant misstates the applicable legal standard for infringement and argues

2

defendant has infringed, or induced the infringement of, the '503 patent because defendant and certain third parties, acting at arm's length, combine to perform all the steps of a claimed method.

## BACKGROUND

In undertaking its analysis, this court is mindful that it accepts as true all well-pleaded allegations of the plaintiff and views them in the light most favorable to him, based on the established law of this circuit, as set forth more particularly below. Plaintiff alleges that the '503 patent, entitled "Active Reservation System," issued November 5, 2002. (Am. Compl. ¶8, DE 14; see also DE 14-1)[2]. The '503 patent is a method patent with four claims. (DE 14-1). The claimed methods generally address a reservation system that controls an inventory. (Am. Compl. ¶7). More specifically, the patent provides a process whereby local vendors or event owners can track and sell their limited inventory both locally, and online. (See DE 14-1, at 12-13). It also allows third parties, using an internet connection, to view the remaining quantity of inventory and make purchases therefrom. (Id.). Once the purchase is completed, the local vendor or owner's remaining inventory updates and reflects the purchase. (See id.).

Defendant operates a reservation system specifically aimed at selling tickets to sporting events, concerts, or theatrical performances. (Am. Compl. ¶13). Defendant's system is used by professional ticket resellers, and other individuals who are "screened" by defendant to sell tickets (collectively "Sellers"), to events to internet-based consumers. (Id.). The reservation system used by defendant, and marketed toward the Sellers, largely mimics that disclosed in the '503 patent. (Id. ¶¶ 19-20). However, defendant's system does not perform all the steps of plaintiff's claimed invention. (Id. ¶¶20, 23).

---

[2]The '503 patent is attached to and referenced in the complaint. Thus, the court may consider its contents upon motion for judgment on the pleadings. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

3

Rather, defendant's reservation system performs *some* of the steps claimed in the '503 patent,
with the Sellers performing the other steps of the claimed invention. (Id.). Defendant offers
financial incentives to Sellers that use its system, which undercut other similar financial incentives
used in the industry. (Id. ¶21).

## COURT'S DISCUSSION

A.    Standard of Review

In reviewing a motion for judgment on the pleadings, under Rule 12(c), the court applies "the
same standard" as for motions to dismiss made pursuant to Rule 12(b)(6). Edwards v. City of
Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). A motion to dismiss under Rule 12(b)(6) tests the
legal sufficiency of the complaint but "does not resolve contests surrounding the facts, the merits
of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir.
1992). A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state
a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds . . . does not
impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a
reasonable expectation that discovery will reveal [the] evidence" required to prove the claim.
Twombly, 550 U.S. at 556.

Furthermore, the complaint need not set forth "detailed factual allegations," but instead must
simply "plead sufficient facts to allow a court, drawing on 'judicial experience and common sense,'
to infer 'more than the mere possibility of misconduct.'" Nemet Chevrolet, Ltd. v.
Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679). In
evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in

the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments."  Id. at 255 (citations omitted).

B.    Analysis

1.    Direct Infringement, 35 U.S.C. § 271(a)

A method patent, like the '503 patent, is directly infringed "only if each step of the claimed method is performed." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2007). Direct infringement may occur in one of two ways.  First, and most obviously, direct infringement occurs where every step of a claimed method is performed by one party.  See id. The parties do not dispute that defendant does not perform all the steps of any claim.  For example, the complaint explicitly provides that defendant's reservation system only performs "some of the steps" claimed in the '503 patent.  (Am. Compl. ¶19).

Direct infringement also may occur where the combined actions of multiple parties work together to perform every step of a claimed method.  Muniauction, 532 F.3d at 1329.  This is called joint or divided infringement.  Liability predicated on divided infringement requires the patent holder prove the accused infringer performs all the steps of the claimed method through a combination of the accused infringer's actions and the actions of another acting under the direction or control of the accused infringer.  Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1362 (Fed. Cir. 2013).  "Direct infringement has not been extended to cases in which multiple independent parties perform the steps of the method claim." Id. (citations and quotations omitted).

5

The direction or control standard "is satisfied where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." Muniauction, 532 F.3d at 1330. Thus, to state a claim for direct infringement under a theory of divided infringement, plaintiff must allege defendant exercised "direction or control over [the Sellers] in a principal-agent relationship or like contractual relationship." Aristocrat, 709 F.3d at 1363.

Here, plaintiff has not done so. First, the complaint contains no allegations the Sellers are defendant's agents. In fact, given the allegation defendant offers incentives to entice the Sellers to use its reservation system, (Am. Compl. ¶18), it follows that the Sellers are acting not on defendant's behalf, but in their own best interest by using the system. Plaintiff, moreover, does not allege the existence of a contract between defendant and the Sellers requiring the Sellers to complete the steps necessary to infringe the '503 patent.

The complaint suggests defendant should be held liable where it makes the use of its reservation system irresistible through the use of "industry low" rates, which provide high profit margins for the Sellers. (Id.). However, the Federal Circuit recently rejected an analogous argument in Aristocrat. There, plaintiff, a patent holder for certain video gambling machines, argued the accused infringer, a purveyor of competing gambling devices, "directed or controlled" the conduct of third parties using its machines, where it incentivized use that brought about consummation of the remaining steps of the claimed method. Aristocrat, 709 F.3d at 1362-63. Plaintiff argued defendant had satisfied the directed or controlled standard, because the players actions were a "natural, ordinary, and reasonable consequence" of defendant's conduct. Id. at 1363. The Federal

6

Circuit flatly rejected this argument, noting that "[o]ur case law does not recognize the test [plaintiff] proposes." Accordingly, application of that theory would be inappropriate here.

Nevertheless, plaintiff vigorously contests this inevitable result as, what he believes to be, application of an errant standard for divided infringement. Instead, plaintiff contends, the court should apply the standard for joint infringement articulated by the Federal Circuit in On-Demand Machine Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1334-35 (Fed. Cir. 2004). In that case, the Federal Circuit noted it "discern[ed] no flaw" with a jury instruction stating "Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method. Where infringement is the result of the participation and combined action(s) of one or more persons or entities, they are joint infringers and are jointly liable." Id. In support of this argument, plaintiff asserts this case was decided prior to divided infringement cases requiring direction or control, has never been overruled, and has been ignored impermissibly by subsequent panels of the Federal Circuit.

Plaintiff's argument is without merit. The Federal Circuit has not ignored its On-Demand decision. To the contrary, the court has made clear that, where the statement in question was accompanied by no analysis and was irrelevant to the issues presented, it is *dicta*. See BMC Res. Inc. v. Paymentech, L.P., 498 F.3d 1373, 1379-80 (Fed. Cir. 2007) (citing On-Demand, 422 F.3d at 1334-35). The controlling rule, consistently applied by the Federal Circuit, is where multiple parties perform all the steps of a claimed method, there is no direct infringement unless one party exercises control. Aristocrat, 709 F.3d at 1632; Muniauction, 532 F.2d at 1329; BMC Res., 498 F.2d at 1381-82.

7

In sum, plaintiff has failed to successfully allege direct infringement. The complaint admits defendant has not completed all steps necessary to infringe the claimed invention on its own. Nor does the complaint allege facts permitting the inference that defendant directs or controls the theaters in their actions. Finally, with regard to plaintiff's argument in support of changing the law, the court is not persuaded, as Federal Circuit precedent forecloses on plaintiff's arguments.

2.    Induced Infringement, 35 U.S.C. § 271(b).

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). The Supreme Court recently clarified the standard for inducement liability in Limelight Networks v. Akamai Technologies, 134 S. Ct. 2111 (2014). There, the Court held an accused infringer may not be held liable for inducement, under § 271(b), where no direct infringement has occurred. Id. at 2117-18. Accordingly, defendant cannot be liable for inducement absent direct infringement by the Sellers.

Here, plaintiff fails to allege the Sellers directly infringed the '503 patent. Direct infringement requires the accused infringer, the Sellers for purposes of this discussion, perform all the steps of a claimed method. Aristocrat, 709 F.3d at 1362. Here, plaintiff has failed to allege the Sellers perform all the steps of any claimed method, either individually or through direction or control of a third party. In particular, the complaint only alleges the Sellers completed *some* of the steps necessary to infringe the patent. (See Am. Compl. ¶23).

Thus, in light of the Supreme Court's decision in Limelight Networks, plaintiff has failed to state a claim for induced infringement. The complaint contains no facts from which the court can conclude the '503 patent was infringed by the Sellers directly. Where there is no direct infringement under § 271(a), there can be no inducement under § 271(b). Defendant is entitled to judgment.

8

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is GRANTED.

(DE 36).  The clerk is DIRECTED to close this case.

SO ORDERED, this the 26th day of February, 2015.


_____
LOUISE W. FLANAGAN
United States District Judge

9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT MANKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGMENT** |
| | ) | |
| | ) | No. 5:13-CV-717-FL |
| VIVID SEATS LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

**Decision by Court.**

This action came before the Honorable Louise W. Flanagan, United States District Judge, for consideration of the defendant's motion for summary judgment.

**IT IS ORDERED, ADJUDGED AND DECREED** in accordance with the court's order entered February 26, 2015, and for the reasons set forth more specifically therein, that defendant's motion for summary judgment is granted.

**This Judgment Filed and Entered on February 26, 2015, and Copies To:**

James R. Lawrence, III (via CM/ECF Notice of Electronic Filing)
Anthony J. Biller (via CM/ECF Notice of Electronic Filing)
Richard T. Matthews (via CM/ECF Notice of Electronic Filing)

February 26, 2015                    JULIE RICHARDS JOHNSTON, CLERK
                                       /s/ Susan W. Tripp
                                      (By) Susan W. Tripp, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CV-716-FL

| | | |
|---|---|---|
| ROBERT MANKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| FANDANGO, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).  (DE 55).  Also pending before the court is plaintiff's motion to dismiss defendant's counterclaims for failure to state a claim upon which relief can be granted, under Rule 12(b)(6).  (DE 50).   For the reasons stated below, defendant's motion for judgment on the pleadings is granted. The court holds in abeyance decision on plaintiff's motion pending further briefing.

## STATEMENT OF THE CASE

Plaintiff, inventor and owner of United States Patent Number 6,477,503 ("the '503 patent") which is generally directed to a reservation system that controls inventory, filed complaint October 14, 2013, against defendant, an online retailer of movie tickets. [1]  The complaint alleges defendant directly infringed the '503 patent in violation of 35 U.S.C. § 271(a) and induced infringement of the

---

[1]  On the same date a corresponding lawsuit was filed by plaintiff against another operator of a reservation system aimed at selling tickets, alleging similar violations of or relating to the '503 patent.  Robert Mankes v. Vivid Seats Limited, 5:13-CV-717-FL.  Order entered this date in that case disposes the defendant's motion for judgment on the pleadings on the same grounds as here.

'503 patent, in violation of 35 U.S.C. § 271(b). Defendant responded with a motion to dismiss later mooted by the court's allowance of plaintiff's motion to amend, resulting in an amended complaint filed March 7, 2014.

Plaintiff alleges a system operated by defendant which is used throughout the country by theaters for selling movie tickets which uses some of the steps of the claimed invention. The other steps of the invention allegedly are induced by defendant to be performed by its customers. Plaintiff seeks a declaration of infringement, an injunction, accounting, and damages.

Defendant denied liability in answer filed March 24, 2014. Defendant also asserted two counterclaims: 1) non-infringement and 2) invalidity. The court earlier had sought to initiate the parties' planning and scheduling activities, precipitating defendant's motion to phase discovery, filed March 7, 2014.

However, before the court could address that motion, on April 11, 2014, the parties jointly moved to stay proceedings pending the outcome of the United States Supreme Court's decision in Limelight Networks, Inc. v. Akamai Technologies, Inc., 134 S. Ct. 2111 (2014). The Supreme Court issued its opinion in Limelight Networks on June 2, 2014, and after some maneuvering related to the Federal Circuit's response to that decision, and whether a continued stay of this case, as urged by plaintiff, would be appropriate, ultimately stay was lifted.

Plaintiff filed his motion to dismiss defendant's counterclaims on September 3, 2014. On October 15, 2014, defendant filed its motion for judgment on the pleadings.

Briefly, in its motion for judgment on the pleadings, defendant argues plaintiff's allegations belie both his infringement and inducement claims. In particular, defendant argues plaintiff has not alleged direct infringement, where he fails to allege defendant performs every step of any claim, or

2

that defendant exercises control over other parties committing some of the steps of the claimed methods. In addition, defendant contends plaintiff has not alleged inducement, as the facts do not support the inference the '503 patent has been directly infringed.

Plaintiff does not dispute that no one entity performs every step of any claim. Rather, plaintiff contends defendant misstates the applicable legal standard for infringement and argues defendant has infringed, or induced the infringement of, the '503 patent because defendant and certain third parties, acting at arm's length, combine to perform all the steps of a claimed method.

## FACTUAL BACKGROUND

In undertaking its analysis, this court is mindful that it accepts as true all well-pleaded allegations of the plaintiff and views them in the light most favorable to him, based on the established law of this circuit, as set forth more particularly below. Plaintiff alleges that the '503 patent, entitled "Active Reservation System," issued November 5, 2002. (Am. Compl. ¶8, DE 29; see also DE 29-1)[2]. The '503 patent is a method patent with four claims. (DE 29-1). The claimed methods generally address a reservation system that controls an inventory. (Am. Compl. ¶7). More specifically, the patent provides a process whereby local vendors or event owners can track and sell their limited inventory both locally, and online. (See DE 29-1, at 12-13). It also allows third parties, using an internet connection, to view the remaining quantity of inventory and make purchases therefrom. (Id.). Once the purchase is completed, the local vendor or owner's remaining inventory updates and reflects the purchase. (See id.).

---

[2]The '503 patent is attached to and referenced in the amended complaint. Thus, the court may consider its contents upon motion for judgment on the pleadings. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

3

Defendant operates a reservation system specifically aimed at selling movie tickets.  (Am. Compl. ¶13).  Defendant's system is used by movie theaters throughout the United States to sell movie tickets to internet-based consumers.  (Id. ¶¶13-14).  The reservation system used by defendant, and marketed toward theaters, largely mimics that disclosed in the '503 patent.  (Id. ¶¶ 17, 20).  However, defendant's system does not perform all the steps of plaintiff's claimed invention.  (Id.).  Rather, defendant's reservation system performs *some* of the steps claimed in the '503 patent, with the theaters performing the other steps of the claimed invention.  (Id. ¶17). Defendant offers financial incentives to theaters that use its system.  (Id. ¶19).

## COURT'S DISCUSSION

A.   Defendant's Motion for Judgment on the Pleadings

1.   Standard of Review

In reviewing a motion for judgment on the pleadings, under Rule 12(c), the court applies "the same standard" as for motions to dismiss made pursuant to Rule 12(b)(6).  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556.

4

Furthermore, the complaint need not set forth "detailed factual allegations," but instead must simply "plead sufficient facts to allow a court, drawing on 'judicial experience and common sense,' to infer 'more than the mere possibility of misconduct.'" Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679). In evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Id. at 255 (citations omitted).

2.     Analysis

   a.     Direct Infringement, 35 U.S.C. § 271(a)

A method patent, like the '503 patent, is directly infringed "only if each step of the claimed method is performed." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2007). Direct infringement may occur in one of two ways. First, and most obviously, direct infringement occurs where every step of a claimed method is performed by one party. See id. The parties do not dispute that defendant does not perform all the steps of any claim. For example, the complaint explicitly provides that defendant's reservation system only performs "some of the steps" claimed in the '503 patent. (Am. Compl. ¶17).

Direct infringement also may occur where the combined actions of multiple parties work together to perform every step of a claimed method. Muniauction, 532 F.3d at 1329. This is called joint or divided infringement. Liability predicated on divided infringement requires the patent holder prove the accused infringer performs all the steps of the claimed method through a combination of the accused infringer's actions and the actions of another acting under the direction

5

or control of the accused infringer.  Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech., 709 F.3d

1348, 1362 (Fed. Cir. 2013).  "Direct infringement has not been extended to cases in which multiple

independent parties perform the steps of the method claim." Id. (citations and quotations omitted).


The direction or control standard "is satisfied where the law would traditionally hold the

accused direct infringer vicariously liable for the acts committed by another party that are required

to complete performance of a claimed method." Muniauction, 532 F.3d at 1330. Thus, to state a

claim for direct infringement under a theory of divided infringement, plaintiff must allege defendant

exercised "direction or control over [the theaters] in a principal-agent relationship or like contractual

relationship." Aristocrat, 709 F.3d at 1363.

Here, plaintiff has not done so.  First, the complaint contains no allegations the theaters are

defendant's agents.  In fact, given the allegation defendant offers incentives to entice the theaters

to use its reservation system, (Am. Compl. ¶18), it follows that the theaters are acting not on

defendant's behalf, but in their own best interest by using the system.  Plaintiff, moreover, does not

allege the existence of a contract between defendant and the theaters requiring the theaters to

complete any steps of any claimed method.

The complaint suggests defendant should be liable for direct infringement where it offers the

theaters incentives to use its system.  (Id.). However, the Federal Circuit recently rejected an

analogous argument in Aristocrat.  There, plaintiff, a patent holder for certain video gambling

machines, argued the accused infringer, a purveyor of competing gambling devices, "directed or

controlled" the conduct of third parties using its machines, where it incentivized use that brought

about consummation of the remaining steps of the claimed method.  Aristocrat, 709 F.3d at 1362-63.

6

Plaintiff argued defendant had satisfied the directed or controlled standard, because the players actions were a "natural, ordinary, and reasonable consequence" of defendant's conduct. Id. at 1363. The Federal Circuit flatly rejected this argument, noting that "[o]ur case law does not recognize the test [plaintiff] proposes." Accordingly, application of that theory would be inappropriate here.

Nevertheless, plaintiff vigorously contests this inevitable result as, what he believes to be, application of an errant standard for divided infringement. Instead, plaintiff contends, the court should apply the standard for joint infringement articulated by the Federal Circuit in On-Demand Machine Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1334-35 (Fed. Cir. 2004). In that case, the Federal Circuit noted it "discern[ed] no flaw" with a jury instruction stating "Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method. Where infringement is the result of the participation and combined action(s) of one or more persons or entities, they are joint infringers and are jointly liable." Id. In support of this argument, plaintiff asserts this case was decided prior to divided infringement cases requiring direction or control, has never been overruled, and has been ignored impermissibly by subsequent panels of the Federal Circuit.

Plaintiff's argument is without merit. The Federal Circuit has not ignored its On-Demand decision. To the contrary, the court has made clear that, where the statement in question was accompanied by no analysis and was irrelevant to the issues presented, it is *dicta*. BMC Res. Inc. v. Paymentech, L.P., 498 F.3d 1373, 1379-80 (Fed. Cir. 2007) (citing On-Demand, 442 F.3d at 1334-35). The controlling rule, consistently applied by the Federal Circuit, is where multiple parties perform all the steps of a claimed method, there is no direct infringement unless one party exercises

7

control. Aristocrat, 709 F.3d at 1632; Muniauction, 532 F.2d at 1329; BMC Res., 498 F.2d at 1381-82.

In sum, plaintiff has failed to successfully allege direct infringement. The complaint admits defendant has not completed all steps necessary to infringe the claimed invention on its own. Nor does the complaint allege facts permitting the inference defendant directs or controls the theaters in their actions. Finally, with regard to plaintiff's argument in support of changing the law, the court is not persuaded, as Federal Circuit precedent forecloses on plaintiff's arguments.

b.     Induced Infringement, 35 U.S.C. § 271(b).

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). The Supreme Court recently clarified the standard for inducement liability in Limelight Networks v. Akamai Technologies, 134 S. Ct. 2111 (2014). There, the Court held an accused infringer may not be held liable for inducement, under § 271(b), where no direct infringement has occurred. Id. at 2117-18. Accordingly, defendant cannot be liable for inducement absent direct infringement by the theaters.

Here, plaintiff fails to allege the theaters directly infringed the '503 patent. Direct infringement requires the accused infringer, the theaters  for purposes of this discussion, perform all the steps of a claimed method. Aristocrat, 709 F.3d at 1362. Here, plaintiff has failed to allege the theaters perform all the steps of any claimed method, either individually or through direction or control of a third party. In particular, the complaint only alleges the theaters completed *some* of the steps necessary to infringe the patent. (See Am. Compl. ¶20).

Thus, in light of the Supreme Court's decision in Limelight Networks, plaintiff has failed to state a claim for induced infringement. The complaint contains no facts from which the court can

8

conclude the '503 patent was infringed by the theaters directly.  Where there is no direct infringement under § 271(a), there can be no inducement under § 271(b).  Defendant is entitled to judgment on the pleadings.

B.     Plaintiff's Motion to Dismiss

The court holds in abeyance its decision on plaintiff's motion to dismiss defendant's counterclaims, pending further briefing on this matter, in light of the court's decision herein rendered on defendant's motion for judgment on the pleadings.  Plaintiff shall have **21 days** from the date of entry of this order to file its supplemental brief.  Thereafter, defendant shall have an additional **14 days** to respond.  Plaintiff's reply, if any is sought, shall be due no more than **seven days** after defendant's response is filed.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, the court GRANTS defendant's motion for judgment on the pleadings.  The court HOLDS IN ABEYANCE decision on plaintiff's motion to dismiss for failure to state a claim upon which relief can be granted pending further briefing as herein ordered.

SO ORDERED, this the 26th day of February, 2015.

LOUISE W. FLANAGAN
United States District Judge

<div align="center">

9

</div>

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

|  |  |  |
|---|---|---|
| ROBERT MANKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGMENT** |
| | ) | |
| | ) | No. 5:13-CV-716-FL |
| FANDANGO, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Decision by Court.**

This action came before the Honorable Louise W. Flanagan, United States District Judge, for consideration of defendant's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).

**IT IS ORDERED, ADJUDGED AND DECREED** in accordance with the court's order entered February 26, 2015, and for the reasons set forth more specifically therein, that defendant's motion for judgment on the pleadings is GRANTED.

**This Judgment Filed and Entered on March 5, 2015, and Copies To:**
D. Kyle Deak (via CM/ECF Notice of Electronic Filing)
Gregory P. Currey  (via CM/ECF Notice of Electronic Filing)
Robert J. Aylward  (via CM/ECF Notice of Electronic Filing)


March 5, 2015                    JULIE RICHARDS JOHNSTON, CLERK
                                 /s/ Christa N. Baker
                                 (By) Christa N. Baker, Deputy Clerk

US006477503B1

(12) **United States Patent**
Mankes

(10) **Patent No.:** US 6,477,503 B1
(45) **Date of Patent:** Nov. 5, 2002

(54) **ACTIVE RESERVATION SYSTEM**

(76) Inventor: **Robert O. Mankes**, 4602 Mill Village Rd., Raleigh, NC (US) 27612

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/467,501

(22) Filed: **Dec. 20, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/142,784, filed on Jul. 8, 1999.

(51) **Int. Cl.**[7] .............................................. G06F 17/60
(52) **U.S. Cl.** ........................................................ 705/5
(58) **Field of Search** ................... 705/5, 6; 340/825.28, 340/825.29

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,581,461 A | * | 12/1996 | Coll et al. | 705/5 |
| 5,832,452 A | * | 11/1998 | Schneider et al. | 705/58 |
| 5,842,176 A | * | 11/1998 | Hunt et al. | 705/5 |
| 5,864,818 A | * | 1/1999 | Feldman | 705/5 |

OTHER PUBLICATIONS

"Article entitled: Lanyon: Industry leading RFP assist eclipsed by new Lanyon solution, RFP Publisher; Web–enabled property vault compliant RFP publisher defines next generation in hotel RFP processing", published by M2 Communications, Dec. 18, 2000.*

* cited by examiner

Primary Examiner—Sam Rimell
(74) Attorney, Agent, or Firm—Mills Law Firm PLLC

(57) **ABSTRACT**

An active reservation system that allows an event vendor to maintain a stand-alone inventory control system which ties directly to an active reservation server, which in turn is distributed through Internet-based reservation systems (web sites) to the users of the Internet. The reservation system includes a local event server that provides the means of maintaining the inventory and the communications with the active reservation server. The local event server allows the event vendor to allocate, control and reserve their inventory at their place of business. This server can then communicate over a network to an active reservation server, which maintains data that Internet-based reservation systems use to provide access to the inventory. The event vendor maintains total control over their inventory while allowing access to that inventory by a much larger audience.

**4 Claims, 9 Drawing Sheets**



EXHIBIT A



FIG. 1



120 → CONSUMER LOGS ONTO ACTIVE RESERVATION SERVER (ARS) THROUGH A WEB PAGE

122 → CONSUMER PICS FROM A LIST OF AVAILABLE INVENTORY TYPES

124 → CONSUMER MAKES A SPECIFIC INVENTORY REQUEST BASED ON AVAILABLE DATA

126 → CONSUMER ENTERS APPROPRIATE PERSONAL INFORMATION

128 → THE REQUEST AND PERSONAL INFORMATION ARE SENT TO THE ARS

130 → THE ARS RECEIVES THE REQUEST IN REAL TIME AND QUEUES THE REQUEST FOR THE EOS TO PICK UP

132 → THE EOS CONFIRMS THE REQUEST AND UPDATES THE ARS (THE EOS IS IN CONTROL OF THE TRANSACTION)

134 → THE ARS THEN NOTIFIES THE CONSUMER THE TRANSACTION IS COMPLETE AND PROVIDES A CONFIRMATION NUMBER

FIG. 2



FIG. 3



FIG. 4





FIG. 5



FIG. 6



FIG. 7



100
EVENT OWNER LOGS ONTO ACTIVE RESERVATION SERVER (ARS)
THE EVENT OWNER LOGS INTO THE ARS BY MEANS OF AN INTERNET CONNECTION AND COMMUNICATES TO THE SQL SERVER BY MEANS OF AN ODBC CONNECTION
102
EVENT OWNER INPUTS COMPANY SPECIFIC INFORMATION INTO ARS
COMPANY NAME, ADDRESS, PHONE NUMBER, CREDIT CARDS TAKEN, INVENTORY SPECIFIC CONDITIONS, ETC.
104
EVENT OWNER INPUTS INVENTORY DATA INTO THE EOS WHICH IS THEN REPLICATED TO THE ARS
TEE TIMES, DINER RESERVATIONS, MOVIE RENTALS, SALON APPOINTMENTS, ETC.
106
EVENT OWNER INPUTS RATE DATA INTO ARS
DIFFERENT RATES FOR DIFFERENT CLASSES OF TIME, CONSUMER, DISCOUNT, ETC.
108
EVENT OWNER INPUTS RESELLER DATA INTO ARS
EVENT OWNER WILL DECIDE WHICH RESELLERS TO GIVE ACCESS TO THEIR DATA
110
EVENT OWNER INPUTS KNOWN CONSUMER DATA INTO ARS
MEMBERS NAMES, ID NUMBERS AND PIN NUMBERS ARE STORED IN THE ARS
112
EVENT OWNER INPUTS SPECIAL INVENTORY CONDITIONS INTO ARS
CERTAIN INVENTORY MAY CONTAIN SPECIAL CONDITIONS WHICH NEED TO BE DISPLAYED TO THE CONSUMER

FIG. 8



FIG. 9

**1**

## ACTIVE RESERVATION SYSTEM

### RELATED APPLICATIONS

This applications claims the benefit under 35 USC 120 of U.S. Provisional Application No. 60/142,784 filed on Jul. 8, 1999.

### FIELD OF INVENTION

This invention relates to reservation systems for goods and services, and, in particular, to a system for reserving available inventory under the control of the inventory holder, while providing access to their inventory through Internet communication networks.

### BACKGROUND OF THE INVENTION

Various inventory control and reservation systems are employed for goods and services. The present invention will be described with primary reference to the reservation of accommodations, such as hotel and motel rooms. However, it will be readily apparent that the present reservation systems may be used in a wide variety of applications wherein an inventory is made available for local, on-site transactions and remotely made available through telecommunications networking and the Internet in particular. Accordingly, the system may be used for entertainment and sporting activities, vehicle rentals, tour packages and like activities wherein the inventory demand arises on site or off-site, contemporaneously or subsequently.

The accommodations sector, particularly motels and hotels, has changed in recent time. Whereas previously local, independently operated establishments were predominant and made reservations at point of sale, chains and franchises operating nationally under a common name have become predominant. In order to serve more fully the national market, such businesses have employed a central reservation system accessed through toll free numbers. Typically, a central reservation system has been used in conjunction with a local system at the site of the inventory to sell available inventory. Therein, the local system assesses the local market, retains a portion of the inventory for local sale, and transfer the remaining inventory to the central reservation systems for distribution. This creates an open looped system wherein the two blocks of inventory are processed independently, each under the control of an autonomous administrator and neither having contemporaneous information on the overall state of the local inventory. While the central system status may be queried by the local site, reallocation of the central inventory is difficult and requires manual intervention through conventional communication sources, typically person-to-person phone conversations. In such systems, the central system will book reservations only until depletion, thereafter declining reservations even though inventory remains available at the local site. Further, the local site cannot accept reservations in excess of the local allotment even though the central system has uncommitted inventory. As a result, the local system may operate at under capacity.

In such a setting and operation, the typical central reservation system is a closed system. Only authorized personnel can query the data and procure the inventory. The communication between the event vendor and the central reservation system is usually done via a dedicated data line on a permanently connected or intermittently connected basis. This effectively limits the accessibility of the data to only those authorized few and, in the case of intermittent systems, not in real time.

**2**

Various approaches have been under taken to overcome the above limitations while affording some of the features achieved with the present invention.

For example, U.S. Pat. No. 5,319,548 to Germain discloses an interactive system that collects and analyzes golf information that is recorded on individual golf play recording cards. The recording cards also store course information such as weather conditions, etc., for the use of individual players. This system also can be set up to be a central database for storing tee-time reservations for courses worldwide.

U.S. Pat. No. 5,422,809 to Griffin et al. discloses a system providing travel destination information and making travel destinations. The system includes an information storage and retrieval system for storing, referencing, and retrieving various travel destinations from a database. This type system includes individual kiosk screens. However, the individual screens are connected to a central database that stores the information and the system can then access individual travel destinations to make reservations. The system is controlled by the central database to the exclusion of the local site.

U.S. Pat. No. 5,581,461 to Coll et al. discloses a central reservation system that manages data shared among a central database and a number of remote databases. This system is an example of the aforementioned central reservation system, with a central database that store various reservation information and is linked to several travel destinations, rather than the central database being located in the travel destination itself

U.S. Pat. No. 5,732,398 to Tagawa discloses a self-service system for selling travel-related services or products. However, this system uses a database that searches all available products, essentially taking the place of a travel agent, and is not linked directly between the local inventory site and the end user.

U.S. Pat. No. 5,797,126 to Helbling et al. discloses an automated system of viewing and dispensing theater tickets. This system acts like a central reservation system communicating directly with the consumer. All of the consumer's actions must be processed through the central station before processing with the theater.

U.S. Pat. No. 5,864,818 to Feldman discloses a system of an automated hotel reservation processing method and system. This system acts as a central reservation system in that the hotel receives reservations from a separate terminal that is accessed by travel agents or other authorized users.

Finally, U.S. Pat. No. 5,901,287 to Bull discloses a system of aggregating and synthesizing data gathered from disparate sources such as those available on a network of the Internet type. This system is more of a user profile synthesizing system that tracks a user's on-line activities for individually tailored network use, rather than a system of collecting reservation data at specific establishments.

### SUMMARY OF THE INVENTION

In view of the foregoing limitations, the present invention has been developed to provide a system in which the event vendor's entire inventory resides at and is controlled at the local point of sale site. Rather than the vendor giving up control and sending its inventory to a central reservation system for eventual sale, the vendor itself maintains control of its inventory at its own location and allows access to the data to whomever it decides, rather than only authorized users of a central reservation system. Once the inventory is sold through one of many networked affiliations, a local transaction removes the item from available inventory both

US 6,477,503 B1

3

on-site and off-site. Thus, the present invention has been developed to allow event vendors to maintain their current reservation practices and control their inventory while providing access to their inventory by anyone with Internet access.

Herein, the event vendor uses a local event owner server to allocate, control and reserve their inventory at their place of business. The local server communicates over an Internet network to an active, remotely located reservation server. The reservation server maintains data on an Internet-based reservation systems and provides networked access to consumers therethrough to provide access to the inventory. Thus, the event vendor maintains total control over the local inventory while allowing access to that inventory by a much larger audience, namely anyone using Internet-based reservation systems that are available on the Internet. Upon confirming purchase of an inventory item, the local event server removes the item from the local server and accesses the reservation server to make a corresponding deduction.

The present invention thus provides method for operating a system for locally and remotely reserving the purchase of goods and services using a local event server located at a local site and a reservation server with replicated data at a remote site using Internet connections. The local event server maintains an inventory of available goods and services and designates a rate structure for each of said goods and services. The local server allocates a portion of the inventory as reservation server inventory and transfer such data to the reservation server. The reservation server through web sites of their desired format makes the allocated inventory available to consumers through secondary Internet connections. The reservation server receives from consumers prospective reservations for discrete items and relevant consumer information. The reservation server communicates the prospective reservations to the local server. The local server accepts the prospective reservations and removes the items from the reservation inventory and establishes an adjusted reservation server inventory. The local server creates a confirmation and communicates the adjusted reservation server inventory and said confirmation to the reservation server; which communicates the confirmation to the consumer on an Internet connection.

In view of the above, it is an object of the present invention to provide a reservations system that allows an event vendor's inventory to reside and be controlled at the point of sale through a local event server.

Another object of the present invention is to allow access of an event vendor's inventory to anyone using Internet-based reservation systems (web sites) through an active reservation server, while the event vendor maintains control of its inventory at the point of sale.

A further object of the present invention is to provide a local event server that has the capability to continue to operate should the connection to the active reservation server be lost, where the event vendor can continue point of sale reservation practices.

BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects and advantages of the present invention will become apparent upon reading the following detailed description taken in conjunction with the accompanying drawings in which:

FIG. 1 is a schematic of the active reservation system in accordance with a preferred embodiment of the present invention;

FIG. 2 is a flow diagram illustrating the consumer interface with the active reservation server;

4

FIG. 3 is a schematic diagram of the local server and Internet connection with the active reservation server;

FIG. 4 is a schematic diagram of the active reservation server and the network interface with the event owner server and the consumers;

FIG. 5 is a schematic diagram illustrating the consumer system and the Internet connection with the active reservation system;

FIG. 6 is a schematic diagram of a consumer interface with the active reservation server;

FIG. 7 is a schematic diagram of a known consumer interface with the active reservation server;

FIG. 8 is a schematic diagram of a reseller interface with the active reservation server;

FIG. 9 is a flow diagram of the local event owner inventory control on the reservation system; and

FIG. 10 is a flow diagram of the event owner server processing of reservation requests.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention will be described by reference to the reservation of accommodations. However, it will be readily apparent that the present reservation systems may be used in a wide variety of applications wherein an inventory is made available for local, on-site transactions and remotely made available through telecommunications networking and the Internet in particular. Accordingly, the system may be used for entertainment and sporting activities, vehicle rentals, tour packages and like activities wherein the inventory demand arises on site or off-site, contemporaneously or subsequently.

Referring to the drawings for the purpose of illustrating the preferred embodiments of the present invention and not for limiting same, FIG. 1 illustrates an active reservation system 10 for interfacing an event owner server (EOS) 12, under the control of a local event owner, and a consumer system 14, under the control of a consumer and prospective purchaser of the goods and services of the event owner, with an active reservation system (ARS) 16 located at a remote site and under the control of a third party administrator for facilitating transactions between the consumer and the event owner. The EOS 12 communicates with the ARS 16 through event owner modem 18 and Internet connection 20. The consumer system 14 communicates with the ARS 16 through consumer modem 22 and Internet connection 24.

The EOS 12 is located at a vendor's place of business and provides the means to maintain the local inventory of goods and services and communicate with the ARS 16. The local event server owns and controls the inventory of goods and services made available for sale through the ARS 16. The EOS 12 can function as a stand-alone system if the connection to the ARS 16 is for whatever reason lost. As will become apparent, the local inventory may comprise a variety of goods and services available for sale at the local site. Such goods and services may comprise without limitation accommodations, rentals, sports and entertainment activities, and the like goods and service which are made available at the local site for purchase by consumers.

Referring to FIG. 3, the EOS 12 comprises a computer system 30 communicating with the modem 18 through communication port 32. The system 30 includes a data storage device 34 maintaining for the purposes of the invention the operating system, inventory information, local owner name, inventory information and general inventory condi-

US 6,477,503 B1

**5**

tions. The EOS **12** may comprise typically commercially available computer and software adjuncts used in conjunction with reserving and maintaining an inventory for such goods and services, and accessing Internet services. Preferably, the EOS will be a standard x86 Pentium-class based system with ample CPU, speed memory and hard drive storage to serve the needs of its operation with emphasis on speed and maximum availability.

Referring to FIG. 4, the ARS **16** comprises a computer system **40** communicating with the EOS through an Internet connection and with consumers through network interface **42**. The system **40** includes a data storage device **42** maintaining for the purposes of the invention a network operating system, web server software and data base language including but not limited to Internet information server (IIS) and structured query language (SQL) as well as information related to the goods and services including replicated inventory from the EOS, rate, reseller, known consumers, and special inventory information. The ARS **16** may comprise typically a commercially available computer and software adjuncts for the foregoing functions.. Preferably, the EOS will be a standard x86 Pentium-class based system with ample CPU, speed memory and hard drive storage to serve plural event owners with emphasis on speed and maximum availability.

Consumers in the present system may generally comprise various types: an ordinary consumer purchasing initially or infrequently and subject to the posted rates and conditions, and known consumers frequently purchasing goods and services and with whom special rates, commissions and conditions may apply. For example, known consumers may comprises travel agencies, hotel chains, tour brokers and the like.

Referring to FIG. 5, the consumer system **14** comprises a computer system **50** communicating with the modem **22** through communication port **52**. The system **50** includes a data storage device **54** maintaining an appropriate operating system. The consumer system **50** may comprise typically commercially available system that can achieve an Internet connection and download and receive web pages.

Referring to FIG. 6, the known consumer system **60** also communicates with a modem **62** through communication port **64**. The system **60** includes a data storage device **66** maintaining an appropriate operating system and data relative to the consumer including a member number associated with the event owner and PIN, as well as other information facilitating off-line transactions therebetween. The known consumer system **60** may comprise typically commercially available system that can achieve an Internet connection and download and receive web pages.

As described below, a further class of consumers include resellers who have on line access to rates and conditions differing from the consumer data and generally based on prior arrangements, but for whom the entire transaction may be handled on-line. Access to such separate data can be secured through password control.

Referring to FIG. 7, there is illustrated a comprehensive model for the reservation system incorporating the foregoing modules. Using like designations for the modules, therein the The EOS **12** communicates with the ARS **16** through modem **18** and Internet connection **20**. The consumer system **22** communicates with the ARS **16** through modem **22** and Internet connection **24**. The known consumer system **60** communicates with the ARS **16** through known consumer **65** modem **62** and Internet connection **24**. The reseller system **85** communicates with the ARS **16** through modem

**6**

Internet connection **87**. In the model, all consumers, known consumers and resellers access the event owners data at the ASR **16** through standard Internet connections.

The present invention allows a local event owner to supplement on-site sales with remote orders while retaining control and ownership of the inventory. The following example will reference to an accommodations business wherein rooms are reserved both on-site and through remote, off-site Internet/web site arrangements, keeping in mind that the same or similar operations may be provided for the other above mentioned goods and services.

Therein, a local hotel will have available on a daily basis a number of rooms of varying description, i.e. layout, accessibility, smoking preference, bed descriptions and the like, hereinafter referred to as available local inventory. Using conventional inventory systems, the local vendor can query the system to determine the availability of inventory by such criteria including number of units, rates, dates or other tracked criteria. Experience with local conditions will allow the local vendor to assess the units needed to satisfy on-site demands or local allocation. The remaining inventory, off-site allocation, would then be available for sale through third parties and is hereinafter referred to as off-site inventory, the specifics of which may change during the course of time. As will become apparent, no local allocation need necessarily be maintained. However, to avoid single or multiple large bookings that could exhaust the entire inventory to the exclusion of on-site needs, it is anticipated that the local owner would establish a local allocation, keeping in mind that the present system accommodates ongoing revision thereof in response to local and remote conditions.

The ASR **16** houses a combination of data. Part of this data is replicated from the EOS **12** to allow an accurate representation of the current inventory available from the local event owner. The ASR never changes this replicated data, it only reads it. The EOS **12** periodically updates the replicated data on the ARS **12** guaranteeing that the local event server **10** maintains control over the inventory. The remainder of the data on the active reservation server is not replicated from any other source. The ASR may display and format the data according to their preferences and concurrently represent other vendors of goods and services, similar or differing.

The ASR maintains a replica of certain data elements that reside on the event owner server **12**. These elements represent the information the active reservation server needs to provide an accurate representation of the event owner's inventory available to Internet-based reservation systems **12**. The active reservation server also houses data that is only needed by the Internet-based reservation systems, but is supplied by the local event server **10**. This data is not needed by the local event server **10** for stand-alone operation. The Internet-based reservation systems uses this data to determine how to display available inventory. This data also contains other information, such as address and phone numbers. By storing this data on the active reservation server only, the system remains flexible to changing inventory control needs of the local event owner server administrator.

The local event server **10** provides the means to maintain the inventory and the communications with the active reservation server **11** Control is guaranteed by storing the inventory data locally and replicating it to the active reservation server **16** and by maintaining a one-way connection between the local event server **12** and the active reservation

Add. 34

US 6,477,503 B1

**7**

In this hierarchy, the local event server **12** is considered the owner of the inventory. This allows total control over the inventory, which in turn allows total flexibility in selling the inventory. The data representing the inventory is stored on the local event server **12**, and only parts that are needed by the Internet-based reservation systems are replicated to the active reservation server **16**. The local event server **12** handles the actual replication of the data and this guarantees that the local event server **12** controls the inventory that is seen by Internet-based reservation systems.

The local event server's primary responsibility is as a stand-alone inventory management system. Its secondary responsibility is to replicate data to the active reservation server **16** and process reservation requests on the active reservation server **16**. Should the connection to the active reservation server be lost, the local event server **12** has the capability to continue to operate as a stand-alone inventory management system. This allows the owners of the inventory to continue to sell based on their own business practices. Only Internet-based reservations **12** are affected, and they are restored once the connection is reestablished.

Referring to FIG. **8**, the EOS constructs the interface with the ASR by logging on at block **100** through the Internet connection. Thereat, the EOS communicates with the SQL server through a conventional ODBC connection. Thereafter, the EOS inputs company specific information at block **102**. Such information may include company name, address, telephone number, credits cards accepted, inventory specific conditions and the like. Next, the event owner at block **104** inputs into the EOS inventory data that is replicated to the ARS. For the present hotel example, such information may include classification as to room type, layout, bed availability, smoking preferences, location, and other information establishing discrete classes within the inventory spectrum. Thereafter, the event owner at block **106** inputs rate data corresponding to such classifications. In a parallel module data specific to reseller terms is entered at block **108**. Access may be secured and limited in accordance with conventional practices. At block **110**, the event owner inputs data relative to the known consumer class. Such data may include names, identification and PIN. Further, at block **112**, the event owner inputs special inventory conditions. Such information is for direct display to the consumer and may include cancellation, check out, minimum stay and other aspects of the reservation tied to the inventory in general or a particular item.

Referring to FIG. **2**, a consumer, known consumer or reseller logs on to the ASR through a web page at block **120**. Such a site might represent a plurality of goods and services, one of which is the event owner remote inventory. The consumer selects the event owner category at block **122**. Based on the displayed available inventory according to the consumer's criteria, the consumer makes a specific inventory request at block **124**. At block **126**, the consumer enters appropriate and prompted information. The requested inventory and information is sent to the ASR at block **128**. The ASR at block **130** receives the request in real time and queues the request for the EOS. Referring to FIG. **9**, the event owner server periodically polls the ARS on a predetermined schedule to see if any inventory requests are pending at block **140**. If no new requests are determined at block **142**, the event owner takes no action, block **144**. If a request is pending as at block **146**, the event owner process the request at block **148**. Returning to FIG. **2**, upon determining and approving availability, the EOS at block **132** confirms the request to the ASR and updates the available remote inventory. The ASR then responds to confirmation,

**8**

the ASR issues notification to the consumer and provides a confirmation number at block **134**.

The local event server maintains the inventory through an application that is specific to the inventory type. Such goods and services programs are well known and used by the involved commercial activity. Such programs include definition and description of the inventory as well as the means to sell the inventory locally. Such capability allows the event owner to sell local inventory contemporaneously and gives the local event owner priority in the event of a reservation conflict. To the extent such local sale invades the remote allocation, the EOS issues an appropriate revision to the ASR.

Having the necessary data available on the active reservation server allows any type of reservation system that is needed to be constructed. Any number of Internet-based reservation systems can be tied into the active reservation server and any of these systems can be modified at any time to meet the needs of the individual event vender. These changes are available the next time the Internet-based reservation system is used. These Internet-based reservation systems are used by not only travel agents and booking agents, but also anyone with access to the Internet.

The present invention may, of course, be carried out in other specific ways than those herein set forth without departing from the spirit and essential characteristics of such invention. The present embodiments are, therefore, to be considered in all respects as illustrative and not restrictive, and all changes coming within the meaning and equivalency range of the appended claims are intended to be embraced therein.

What is claimed is:

1. A method for operating an Internet based active reservation system for the purchase of goods and services, comprising:

  (a) providing an owner event server located at and operated by a local event owner having an available inventory of goods and services at a local site;

  (b) providing an active reservation server located at and operated by user remote from said local site, said active reservation server accepting only data from said owner event server and formatting said data for viewing by an Internet-based consumer;

  (c) allocating said available inventory by only said owner event server at all times between local inventory and Internet inventory;

  (d) adjusting said available inventory by only said event owner at said owner event server at all times based on purchases of goods and services at said local event site;

  (e) communicating said allocated Internet inventory only to said active reservation server;

  (f) receiving purchase requests for goods and services in said Internet inventory at said active reservation server from said Internet-based consumer;

  (g) communicating said purchase requests from said active reservation server to said owner event server;

  (h) accepting said purchase requests solely at said local event server and adjusting said Internet inventory only by said owner event server at all times to establish an adjusted Internet inventory;

  (i) communicating said accepting and said adjusted Internet inventory from said owner event server to said active reservation server; and

  (j) communicating said accepting and confirmation indicia relative thereto from said active reservation system to said Internet consumer.

9

2. A method for operating a system for locally and remotely reserving the purchase of goods and services, comprising: establishing an local event server located at a local site: establishing a reservation server at a remote site; communicating said local event server with said reservation server through a first Internet connection; maintaining on said local server an inventory of available goods and services; designating a rate structure for each of said goods and services; allocating a portion of said inventory at all times only at said local event server as reservation server inventory including said rate structure; communicating said reservation server inventory at all times only by said local event server to said reservation server; making available to consumers through secondary Internet connections said reservation server inventory in a reservation server selected format; receiving from consumers through said secondary Internet connection prospective reservations from said consumers for discrete items in said reservation server inventory and consumer identification indicia for such consumers; communicating said prospective reservations from said reservation server to said local server; accepting said prospective reservations only at said local server at all times for said discrete items and removing said discrete items from said reservation inventory only at said local server at all times to establish an adjusted reservation server inventory; creating confirmation accepting indicia of said accepting at said local server; communicating said adjusted reservation server inventory and said confirmation accepting indicia from said local server to said reservation server; communicating said confirmation accepting indicia from said reservation server to said consumers; and making available to consumers through said secondary Internet connections said adjusted reservation server inventory in a reservation server selected format.

3. A method for system for the reserving goods and services at a local site, comprising:

   providing a first server located at said local site and establishing thereon an available inventory of goods and services available at a local site;

   providing an active reservation server located at a remote site not connected with said local site, said active reservation server only accepting data at all times from said local owner event server and only formatting said data for viewing by an Internet-based consumer;

   designating on said local server a compilation of available inventory allocated only at said at said local server at all times between local inventory and Internet inventory;

   accepting reservations for the goods and services only at said local site at all times and adjusting said available inventory at said local server in accordance with said adjusting based on purchases of goods and services at

10

said local event site and adjusting said Internet inventory as required to establish a current Internet inventory;

   communicating said current Internet inventory as data to said reservation server;

   displaying said current Internet inventory at said reservation server in a reservation server selected format on a web site for viewing by prospective consumers;

   receiving purchase requests at said reservation server for goods and services as displayed in said selected format on said web site from consumers for items available in said current Internet;

   communicating said purchase requests from said reservation server to said local server;

   accepting said purchase requests only at said local server at all times;

   adjusting said current Internet inventory to establish an adjusted Internet inventory accounting for the accepting of said purchase requests;

   communicating said accepting and said adjusted Internet inventory from said local server to said reservation server; and

   (j) communicating said reservation server to said consumer through an Internet connection.

4. A locally maintained reservation system for the local and remote reservation of available items, said reservation system comprising: local server means including inventory control means for compiling available items for reservation; means operatively associated with said local server means allocating only at said local server means at all times at least a portion of said available items for remote reservation through an Internet-based web site on reservation serving means; means for communicating to said reservation server means an itemization of said portion of available items and rates and conditions attendant thereto; means associated with said local server means for receiving from said reservation serving means prospective reservations for discrete items in said portion of available items; means associated with said local server means for accepting said prospective reservations only at said local server means at all times and adjusting said portion of available items only at said local server means at all times in accordance therewith to establish a revised portion; and means associated only with said local server means at all times for communicating to said reservation server means said revised portion and supplanting the prior portion whereby reservations and said local site and remote site can be simultaneously processed without redundancy.

\*   \*   \*   \*   \*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 19th day of June, 2015, I caused this Brief of
Appellant to be filed electronically with the Clerk of the Court using the CM/ECF
System, which will send notice of such filing to the following registered CM/ECF
users:

| | |
|---|---|
| Richard T. Matthews | Steven M. Lieberman |
| WILLIAMS MULLEN | Sharon Davis |
| 301 Fayetteville Street, Suite 1700 | ROTHWELL, FIGG, ERNST |
| Post Office Box 1000 | & MANBECK, P.C. |
| Raleigh, North Carolina 27601 | 607 14th Street, NW |
| (919) 981-4070 | Washington, DC 20005 |
| rmatthews@williamsmullen.com | (202) 783-6040 |
| | slieberman@rfem.com |
| | sdavis@rfem.com |

*Counsel for Appellee Vivid Seats LTD.*    *Counsel for Appellee Fandango, LLC*

Upon acceptance by the Clerk of the Court of the electronically filed
document, the required number of copies of the Brief of Appellant will be hand
filed at the Office of the Clerk, United States Court of Appeals for the Federal
Circuit in accordance with the Federal Circuit Rules.

/s/ Anthony J. Biller
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
     28.1(e)(2) or 32(a)(7)(B) because:

     [ X ] this brief contains [*5,674*] words, excluding the parts of the brief
     exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

     [    ] this brief uses a monospaced typeface and contains [*state the number
     of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
     32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     [ X ] this brief has been prepared in a proportionally spaced typeface using
     [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

     [    ] this brief has been prepared in a monospaced typeface using [*state
     name and version of word processing program*] with [*state number of
     characters per inch and name of type style*].

Dated: June 19, 2015          /s/ Anthony J. Biller
                              *Counsel for Appellant*